IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TAREK FARAG and SOONA FARAG,

        Plaintiffs,

      v.

HEALTH CARE SERVICE
CORPORATION, d/b/a BLUE
CROSS BLUE SHIELD OF
ILLINOIS and NOVARTIS
PHARMACEUTICALS CORPORATION,

        Defendants.

Case No. 17 C 2547

Judge Harry D. Leinenweber

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are Motions to Dismiss filed by Defendant Novartis Pharmaceuticals Corporation ("Novartis") [ECF No. 16] and Defendant Health Care Service Corporation d/b/a Blue Cross Blue Shield of Illinois ("BCBSIL") [ECF No. 15]. For the reasons to follow, the Court dismisses Plaintiffs' claims against Novartis with prejudice under Rule 12(b)(1) or, alternatively, under Rule 12(b)(6). Absent those federal question claims, the Court declines to hear Plaintiffs' state law claims against BCBSIL or rule on the latter's Motion. Instead, the Court remands the balance of the case to Kane County Circuit Court.

## I. <u>BACKGROUND</u>

Plaintiffs Tarek and Soona Farag (referred to collectively as "Plaintiffs" and individually as "Tarek" or "Soona") have employer-sponsored health insurance coverage through Defendant BCBSIL. (ECF No. 1 at Ex. 1 ("Compl.") ¶ 1.) Tarek has high blood pressure, and his doctors have tried many medications to treat his condition. (*Id.* ¶ 4.) All have caused side effects with the exception of the brand-name drug Diovan, manufactured by Defendant Novartis, which Tarek's doctors "settled on and prescribed for him long before January 2011." (*Ibid.*) For a brief period "[a]round the beginning of 2013," Tarek tried taking the generic form of Diovan (valsartan), but it "caused him serious side effects." (*Id.* ¶ 5.) Unsurprisingly, valsartan had a cheaper copay than Diovan, for which Tarek paid $30.00 until around June 2013 (when BCBSIL increased the copay for Diovan to $50.00). Plaintiffs allege that the overall price of a one-month supply of Diovan was about $207 during 2013, $270 during 2014, $310 during 2015, and about "$400 during 2017." (*Id.* ¶ 25.)

On April 11, 2015, Tarek's doctor prescribed him twice his usual dose of Diovan. (Compl. ¶ 7.) At some point thereafter, Tarek took medication for numbness in his hands, which caused his blood pressure and heart rate to collapse, leading his

doctor to advise that Tarek stop taking Diovan and only add it back into his medication regimen as he recovered. (*Id.* ¶ 8.) On September 19, 2015, Tarek sought to refill his Diovan prescription and expected to pay his usual $50 copay. However, BCBSIL refused to cover it on the same terms it had previously and instead requested "preauthorization" from Tarek's doctor. (*Id.* ¶ 9.) Tarek's doctor completed the required forms, but BCBSIL denied coverage because Tarek had not taken Diovan "for more than 90 days." (*Id.* ¶ 10.) As a result, BCBSIL required that Tarek pay $173.11 instead of $50.00. (*Id.* ¶ 11.) Despite placing several calls to BCBSIL, Tarek was unable to get the company to remedy the situation. (*Id.* ¶¶ 12-13, 15-17.) On these calls, BCBSIL agents typically justified the denial of coverage on the grounds that Diovan is considered "a Step Therapy medication," requires preauthorization, is dispensed in prescriptions that are valid only for one year, must be taken "for the past 90 days to qualify for the copay of $50," and must be precipitated by an attempt to take the generic. (*Id.* ¶ 27.) Tarek continued taking Diovan and paying the higher rate "with accumulated difference of about $700." (*Id.* ¶ 14.)

Proceeding *pro se*, Plaintiffs filed suit against BCBSIL on May 19, 2016 in Kane County Circuit Court. On May 24, 2016, Tarek "was in a very stressful situation due to the ongoing

court case and the denial of his proper coverage, which caused his blood pressure to go high and fluctuate in a dangerous way that caused him symptoms of a stroke." (Compl. ¶ 19.) He was rushed to the hospital and, roughly $16,000 later, restored to good health. (*Ibid.*) The Kane County court dismissed the claims in Plaintiffs' original complaint without prejudice, and Plaintiffs then filed an Amended Complaint against BCBSIL on October 5, 2016. BCSBIL moved to dismiss the Amended Complaint, and the court obliged – dismissing two claims with prejudice and two claims without prejudice. On March 1, 2017, Plaintiffs amended again, this time adding Novartis as a defendant. This is the operative Complaint.

On the basis of federal question jurisdiction over patent and antitrust claims that Plaintiffs brought against Novartis, Defendants removed the Complaint to this Court on April 4, 2017. (ECF No. 1 ¶¶ 3-6.) Both Defendants now move to dismiss all counts.

## II.   LEGAL STANDARD

When considering a motion to dismiss a complaint, the Court accepts the facts stated in the complaint as true and draws reasonable inferences in favor of the plaintiff. *Newell Operating Co. v. Int'l Union of United Auto., Aerospace, and Agr. Implement Workers of Am.*, 532 F.3d 583, 587 (7th Cir.

2008).  A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007).

Although the Federal Rules of Civil Procedure do not require a complaint to include "detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (internal citations omitted).  To survive a Rule 12(b)(6) motion, "the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Independent Trust Corp. v. Stewart Info. Servs. Corp.,* 665 F.3d 930, 934 (7th Cir. 2012) (internal quotation marks omitted).  The plausibility standard, while not akin to a probability requirement, "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citation omitted).  Where a complaint pleads facts that are merely consistent with liability, it "stops short of the line between possibility and plausibility." *Id.* (internal quotation marks omitted).

Standing is an essential component of Article III's case-or-controversy requirement. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). Rule 12(b)(1) allows a party to raise by motion a federal court's lack of subject-matter jurisdiction, including a lack of standing. *See, Ret. Police Ass'n v. City of Chicago,* 76 F.3d 856, 862 (7th Cir. 1996). The plaintiff then bears the burden of establishing jurisdiction with competent proof of jurisdictional facts. *Scanlan v. Eisenberg,* 669 F.3d 838, 841-42 (7th Cir. 2012).

## III. <u>ANALYSIS</u>

### A. **Novartis**

Against Novartis, Plaintiffs seek a judgment for at least $18,000, compensatory damages, punitive damages, costs and attorneys' fees. They do not seek injunctive relief. According to Plaintiffs, the inventors listed on Novartis' U.S. Patent No. 6,294,197 ("the '197 patent"), which covers a tablet form of valsartan "mixed with additives by compression," are not the same inventors that Novartis lauded for inventing Diovan, meaning that Novartis committed fraud on the United States Patent and Trademark Office ("the PTO") by listing the wrong inventors on the face of the '197 patent. (Compl. ¶ 30.) Plaintiffs further allege that, because the "generic drug for Diovan" caused Tarek "serious side effects" whereas Diovan did

not, Novartis defrauded the PTO by seeking protection for a patent that (it knew) flunked the enablement requirement of 35 U.S.C. § 112(a). (*Id.* ¶¶ 5, 31.) Plaintiffs claim that – ostensibly through these actions and by emerging from the 1996 merger of "two giants Ciba-Geigy and Sandoz" – Novartis has wrongfully "kept others away from manufacturing or selling Diovan or its generic Valsartan" and "unlawfully monopolize[d] the market for Diovan," allowing it to charge higher prices for Diovan than generic drug manufacturers charge for valsartan. (*Id.* ¶¶ 30, 33.)

Without citing any provision of law authorizing their claims, Plaintiffs bring three counts against Novartis: "fraudulently claiming that Novartis' team is the inventors of Diovan," "fraudulently claiming that it has patent protection for Diovan and monopolizing it," and "violating the antitrust laws and abusing of [*sic*] monopoly power." (Compl. ¶¶ 30-32.) The Court finds these counts best characterized as a *Walker Process* claim based on fraudulent procurement of the '197 patent and its subsequent unlawful monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2, plus a claim under Section 7 of the Clayton Act, 15 U.S.C. § 18, challenging the merger that spawned Novartis as "obvious[ly] . . . against the antitrust laws." (Compl. ¶ 33.) (To the extent Plaintiffs might be

seeking relief under the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/3, it is preempted inasmuch as it relates to the *Walker Process* claim. Because there is "simply no theory for proving a *Walker Process* antitrust violation in this case that would not require a showing of misconduct before the PTO," "federal patent law preempts any state antitrust cause of action premised on [such] conduct before the PTO." *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 363 F.Supp.2d 514, 543 (E.D.N.Y. 2005); *see also, Semiconductor Energy Lab. Co., Ltd. v. Samsung Elec. Co., Ltd.*, 204 F.3d 1368, 1382 (Fed. Cir. 2000) (finding preemption where "the wrong alleged and for which state tort damages [were] sought [was] no more than bad faith misconduct before the PTO"); *accord, In re K-Dur Antitrust Litig.*, No. 01-1652, 2007 WL 5297755, at *24-25 (D.N.J. Mar. 2, 2007).)

Novartis moves to dismiss Plaintiffs' counts against it both on Rule 12(b)(1) subject-matter jurisdiction and Rule 12(b)(6) plausibility grounds. Novartis maintains that the Court does not have jurisdiction to grant Plaintiffs their requested relief because neither Plaintiff has standing to challenge the validity or enforceability of the '197 patent – or any patent Novartis holds on Diovan. In the same vein, Novartis asserts that Plaintiffs lack antitrust standing and that their complaint fails to allege a plausible monopolization violation

under federal or state antitrust law.   Finally, Novartis
contends that Plaintiffs' claim for damages is time-barred.

### 1.  *Declaratory Judgment of Invalidity or Unenforceability*

Article III of the Constitution requires an actual "case"
or "controversy" between litigating parties before a court may
adjudicate a dispute.   A party may bring an action under the
Declaratory Judgment Act only if an "actual controversy" exists,
"which is the same as an Article III case or controversy."
*Arris Group, Inc. v. British Telecomms. PLC,* 639 F.3d 1368, 1373
(Fed. Cir. 2011) (citations omitted).   The party seeking a
declaratory judgment must show an Article III case or
controversy at the time it filed for declaratory relief.   *Id.* at
1373 (citing *King Pharm., Inc. v. Eon Labs., Inc.,* 616 F.3d
1267, 1282 (Fed. Cir. 2010)).   When the underlying merits of the
declaratory judgment action involve issues of conduct before the
PTO, Federal Circuit law controls whether an actual controversy
exists.   *3M Co. v. Norton Co.,* 929 F.2d 670, 672 (Fed. Cir.
1991).

This Court must ask whether "the facts alleged, under all
the circumstances, show that there is a substantial controversy,
between parties having adverse legal interests, of sufficient
immediacy and reality to warrant the issuance of a declaratory
judgment."   *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118,

132 n.11 (2007).  A proper dispute must "admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.* at 127 (internal quotation marks omitted).  "A mere adverse *economic* interest is insufficient to create declaratory judgment jurisdiction." *Arris,* 639 F.3d at 1374-75 (emphasis in original).

Plaintiffs' interest in having the '197 patent declared invalid or unenforceable is adverse to Novartis' interest only in a pure economic sense, and is thus far too attenuated to support jurisdiction under the Declaratory Judgment Act.  At best, securing such a judgment would merely inhibit Novartis from excluding competitors, thus leading indirectly to a decrease in the price of Diovan for Tarek.  Indeed, Federal Circuit law suggests that purchasers of goods covered by a patent who do not compete with the patentee and otherwise face no threat of an action for infringement "cannot challenge [the] patent's validity or enforceability through a declaratory judgment action." *Ritz Camera & Image, LLC v. SanDisk Corp.,* 700 F.3d 503, 506 (Fed. Cir. 2012).

The Court therefore dismisses Plaintiffs' claims to the extent they can be construed as a plea for a declaratory

judgment that the '197 patent is invalid or unenforceable as a result of fraud on the PTO.

## 2. *Walker Process Antitrust Action*

As the Court lacks subject-matter jurisdiction to issue a declaratory judgment, Plaintiffs' claims relying on Novartis' alleged misconduct before the PTO resemble antitrust claims under *Walker Process Equip., Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 174 (1965) ("[T]he enforcement of a patent procured by fraud on the Patent Office may be violative of § 2 of the Sherman Act provided the other elements necessary to a § 2 case are present."). *Walker Process* allows a plaintiff to strip a patent holder of its exemption from the antitrust laws if its patent was procured by fraud. *Id.* at 177. (That a claimant may otherwise lack entitlement to a declaratory judgment remedy does not preclude *Walker Process* relief. *See, Ritz Camera,* 700 F.3d at 506.)

### a. *Standing*

The Court must first determine whether Plaintiffs have standing to bring a *Walker Process* claim, as each of their counts invokes Novartis' alleged fraudulent conduct in procuring the '197 patent. As a question ancillary to patent matters, antitrust standing turns on regional circuit law. *See, Shuffle Tech Int'l, LLC v. Scientific Games Corp.,* No. 15 C 3702, 2015

WL 5934834 at *9 (N.D. Ill. Oct. 12, 2015). The Seventh Circuit has not determined whether end users of patented products who did not purchase them from the patentee have standing to assert a *Walker Process* claim. Courts in the Second, Third, and Ninth Circuits have engaged the issue at some length and, even viewed in the light most favorable to Plaintiffs, they lack standing under those cases to pursue a *Walker Process* claim.

First, Novartis' patent is not "already tarnished" by a finding of inequitable conduct. *In re DDAVP Direct Purchaser Antitrust Litig.,* 585 F.3d 677, 691-92 (2d Cir. 2009) (conferring antitrust standing on purchaser plaintiffs to pursue *Walker Process* claim because the patents at issue were "already unenforceable due to inequitable conduct"). Rather, Plaintiffs are seeking to litigate the inequitable conduct issues in tandem with their *Walker Process* antitrust claim. Thus, Plaintiffs do not fall within *DDAVP*'s conferral of standing on *Walker Process* claimants suing on patents found previously to have been procured by fraud.

Nor are Plaintiffs direct purchasers of Diovan from Novartis. *See, e.g., Ritz Camera & Image, LLC v. SanDisk Corp.,* 772 F.Supp.2d 1100 (N.D. Cal. 2011) (finding that direct purchasers had standing to bring Sherman Act monopolization claim alleging that manufacturers of flash memory devices

enforced fraudulently obtained patents), *aff'd, Ritz Camera,* 700
F.3d 503 (Fed. Cir. 2012); *Molecular Diag. Labs. v. Hoffman-
LaRoche, Inc.,* 402 F.Supp.2d 276, 282 (D.D.C. 2005) ("[D]irect
purchasers have standing to pursue *Walker Process* claims.").
Rather, pharmaceutical companies like Novartis typically provide
their manufactured drugs to wholesalers or distributors, who
then furnish them to pharmacies, who in turn dispense them to
patients like Tarek.

Accordingly, Plaintiffs are *indirect* purchasers with
respect to Novartis, and courts confronted with such situations
decline to find *Walker Process* standing. *See, e.g., In re K-Dur
Antitrust Litig.,* 2007 WL 5297755, at *18 ("If this Court were
to conclude that *indirect* purchasers had standing to bring
*Walker Process* claims, it would turn antitrust policy on its
head, and extend antitrust standing to an extraordinary
level[.]"); *In re Ciprofloxacin,* 363 F.Supp.2d at 542 (holding
that non-infringing consumers of patented products complaining
of supracompetitive prices have no cause of action to invalidate
the patent). Nonetheless, the Federal Circuit in *Ritz Camera*
made clear that *Walker Process* standing should be interpreted in
light of regional circuit law on antitrust standing. *See, Ritz
Camera,* 700 F.3d at 506-07. As such, the Court examines the
question more closely in view of Seventh Circuit law that a

private plaintiff, to have antitrust standing, must plausibly allege (1) that it suffered an antitrust injury and (2) that it is an acceptable plaintiff to pursue the alleged antitrust actions. *See, Gatt Commc'ns, Inc. v. PMC Asscs., LLC,* 711 F.3d 68, 76 (7th Cir. 2013).

### *1. Antitrust injury*

Plaintiffs fail to allege a cognizable antitrust injury. First, the Complaint clearly states that at least one form of generic valsartan is available on the market. As such, to the extent Novartis has market power, it is not maintaining it by erecting (insurmountable) barriers to generic entry. Second, the gravamen of the Complaint is that Novartis has injured Plaintiffs by charging higher prices (to direct purchasers, indirectly leading to higher copays) than generic manufacturers charge for generic valsartan. Standing alone, this is hardly revelatory and fails to clear the *Twombly* hurdle: A brand-name drug's higher prices are equally consistent (if not more so) with unilateral exercise of individual market power, which does not violate the antitrust laws. *See, Schor v. Abbott Labs.,* 457 F.3d 608, 610 (7th Cir. 2006) ("The price of Norvir cannot violate the Sherman Act: a patent holder is entitled to charge whatever the traffic will bear."); *accord, In re Brand Name*

*Prescription Drugs Antitrust Litig.,* 186 F.3d 781, 786-87 (7th Cir. 1999).

Thus, Seventh Circuit law suggests that the harm Plaintiffs complain of is not a cognizable antitrust injury.

### 2. *Acceptable plaintiff*

The Court finds further that Plaintiffs are not a proper antitrust plaintiff to bring a *Walker Process* claim against Novartis. Although federal courts have devised a panoply of tests to determine whether an injured party is a proper antitrust plaintiff, two bear particular relevance for the analysis here.

First, *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977), limits damages actions under Section 4 of the Clayton Act to direct purchasers. *Id.* at 735. As indirect purchasers (who purchased Diovan at pharmacies or through intermediary health plans), Plaintiffs have no cognizable Clayton Act damages claim based on charges that direct purchasers of Diovan may have passed on to them. (*See,* Section III.A.3.a.1, *infra.*)

Second, and more specific to Sherman Act claims, is the balancing test in *Associated Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters,* 459 U.S. 519, 536-45 (1983). There, the Supreme Court crafted a multi-factor "direct injury" barometer of whether the plaintiff is a proper party to bring a

private antitrust action. These factors are (1) the causal connection between the violation and the harm; (2) the presence of improper motive; (3) the type of injury and whether it was one Congress sought to redress; (4) the directness of the injury; (5) the speculative nature of damages; and (6) the risk of duplicate recovery and complex damage apportionment. *Loeb Indus., Inc. v. Sumitomo Corp.,* 306 F.3d 469, 484 (7th Cir. 2002) (citing *Associated Gen.,* 459 U.S. at 537-45).

As applied to Plaintiffs' Complaint, too many of these factors are left wanting. Plaintiffs do allege in the barest terms possible an improper motive on the part of Novartis with respect to conduct before the PTO, but their allegation of its improper motive ("greed") in charging higher prices for Diovan than generic manufacturers charge for valsartan is of dubious sufficiency – particularly because greed is not an unlawful motive. *See, Schor,* 457 F.3d at 610. As mentioned previously, the causal connection is loose, the directness of the injury oblique. Further, the damages are speculative; Plaintiffs cannot with a straight face claim that brand-name drugs should cost the same as generics, meaning that "to obtain damages the plaintiffs would have to separate the price effects of [unlawful monopoly activity] from the price effects of the defendant['] s lawful market power." *Brand Name Prescription Drugs,* 186 F.3d

at 786 (citing *Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic,* 152 F.3d 588, 593-94 (7th Cir. 1998)). There also seems a risk of duplicate recovery and complex damages apportionment, because more direct purchasers as well as insurance carriers pay a significant portion of any unlawfully supracompetitive prices that Novartis might be found to charge.

Working within this "direct injury" framework, recent Seventh Circuit cases have found that indirect purchasers lack antitrust standing. For example, where consumers of aluminum-containing products brought an antitrust action against aluminum manufacturers, the court held that such indirect purchasers were not participants in the aluminum market merely "by creating a demand for aluminum." *In re Aluminum Warehousing Antitrust Litig.,* 833 F.3d 151, 161-62 (7th Cir. 2016). Their injuries similarly were not a "necessary step" in carrying out the alleged anti-competitive conspiracy, but instead "down the distribution chain" and "purely incidental," as the alleged scheme would have been just as effective from the defendants' point of view if direct purchasers paid supracompetitive prices without passing that cost on to consumers. *Id.* at 162. The same is true in this case. Plaintiffs cannot claim to be participants in the Diovan market merely because Tarek, by having high blood pressure (and experiencing side effects from valsartan), creates

demand for Diovan. Novartis did not need to injure indirect purchasers like Tarek for the alleged monopolization to work; all it requires is for Novartis' *direct* purchasers – namely, drug wholesalers or distributors – to pay monopoly prices, irrespective of whether they would pass that cost on to pharmacies, or pharmacies to ultimate consumers.

Even if they suffered a cognizable antitrust injury, Plaintiffs are unlikely under Seventh Circuit precedent to qualify as proper antitrust plaintiffs, as they have only an indirect nexus to the alleged monopoly.

\*    \*    \*

Although it appears to be a matter of first impression in this Circuit, the Court holds that *Walker Process* does not confer standing on a party whose only connection to the patentee is as an indirect purchaser of products covered by the patent. Novartis' Rule 12(b)(1) Motion is granted in relevant part.

### b. Fraud on the PTO

Even if Plaintiffs do have standing to bring their *Walker Process* count, their Complaint fails to state a claim on which relief can be granted. Showing fraud on the PTO under *Walker Process* requires evidence that: (1) the patent at issue was procured by knowing or willful fraud on the PTO; (2) the defendant was aware of the fraud when enforcing the patent; (3)

the defendant clearly intended to deceive the examiner; (4) the patent would not have issued but for the misrepresentation or omission. *See, Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059, 1068-71 (Fed. Cir. 1998); *accord, C.R. Bard, Inc. v. M3 Sys., Inc.,* 157 F.3d 1340, 1364 (Fed. Cir. 1998). To state a plausible claim under *Walker Process* that Novartis committed fraud on the PTO, Plaintiffs must therefore adequately allege these elements under Federal Circuit law. *See, Dippin' Dots, Inc. v. Mosey,* 476 F.3d 1337, 1346 (Fed. Cir. 2007) (citation omitted). In addition, because *Walker Process* claims are fraud claims, Plaintiffs must meet the heightened pleading requirements of Rule 9(b). *Medimmune, Inc. v. Genentech, Inc.,* 427 F.3d 958, 967 (Fed. Cir. 2005) ("Like all fraud-based claims, *Walker Process* allegations are subject to the pleading requirements of Fed. R. Civ. P. 9(b)."), *rev'd and remanded on other grounds,* 549 U.S. 118 (2007).

However, Plaintiffs utterly fail to identify any references or statements made to or withheld from the PTO that could plausibly meet the *Walker Process* elements – let alone Rule 9(b)'s required specificity. First, Plaintiffs claim that the inventors of the '197 patent were incorrectly named based on an August 24, 2000 Novartis press release naming different individuals as the "inventor of Diovan(R) (valsartan) and his

research team." (Compl. at Ex. A2.) Novartis maintains, however, that the much earlier U.S. Patent No. 5,399,578 ("the '578 patent") covers the valsartan *compound* and lists the same inventors referenced in the Novartis press release. Even Plaintiffs admit that the '197 patent does not cover the "invention" of valsartan or Diovan but, on the other hand, is directed to "solid oral dosage [of valsartan] formed by compression methods (Compl. ¶ 32). Indeed, the '197 patent expressly discloses that "[t]he preparation of valsartan is described in U.S. patent specification No. 5,399,578." ('197 patent at 2:53-55.) (In ruling on a motion to dismiss for failure to state a claim, the Court may consider documents, like the '197 patent, that are referred to in the Complaint, as well as facts readily ascertainable from sources not subject to reasonable dispute, such as the '578 patent. *See, Williamson v. Curran,* 714 F.3d 432, 436 (7th Cir. 2013); *Ennenga v. Starns,* 677 F.3d 766, 773 (7th Cir. 2012).) That the individuals identified in the Novartis press release as the inventors of Diovan/valsartan are not listed as inventors of the '197 patent gives rise to no reasonable inference in Plaintiffs' favor.

Second, Plaintiffs nod toward a patent issued to Hoffman-LaRoche, Inc., U.S. Patent No. 5,696,116 ("the '116 patent"), claiming that Novartis knew its press release was false because

the '116 patent was the first to disclose valsartan as a compound to treat high blood pressure. The '116 patent application was filed on July 12, 1994, claimed a foreign priority date of July 15, 1993, and issued on December 9, 1997. (Compl. ¶ 20.) However, the '578 patent application disclosing the preparation of a valsartan compound was filed December 29, 1992, claimed a foreign priority date of February 19, 1990, and was issued March 21, 1995. To the extent the '116 patent is relevant to Plaintiffs' *Walker Process* fraud allegations at all, it offers no support for the allegation that Novartis knew its scientists were not the true inventors of Diovan and somehow committed fraud on the PTO in applying for the '197 patent.

Finally, based on side effects Tarek experienced while taking valsartan that he does not experience while taking Diovan, Plaintiffs allege that Novartis "knew that the patent protection for Diovan was invalid" for failure to meet the enablement requirement. Every patent specification must "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same." 35 U.S.C. § 112(a). Yet an individual's experiencing side effects when taking a generic

drug but not the associated brand-name drug, standing alone, lends no plausibility to an enablement invalidity argument.

Even assuming that the valsartan Tarek took was manufactured precisely according to the '197 patent's disclosures – something Plaintiffs do not allege - there are far too many independent factors that could explain Tarek's side effects and are exceedingly more plausible than impugning the '197 patent's written description. For example, "the branded version may be produced under better quality control (the rationale for trademarks)" than the generic. *Brand Name Prescription Drugs,* 186 F.3d at 787. For another, varying absorption rates between the generic and the brand-name drug may account for differing side effects. *See, e.g., IMS Health, Inc. v. Sorrell,* 630 F.3d 263, 267-68 (2d Cir. 2010) ("Bioequivalent generic drugs are not necessarily identical to the brand name version, but are required to demonstrate an absorption rate between 80 and 125 percent of the brand-name drug. Variations in absorption rates among branded or generic drugs may cause different reactions, such as side effects."), *aff'd,* 564 U.S. 552 (2011). Regardless of whether valsartan side effects bear on the sufficiency of the '197 patent's written description, the first salient question for *Walker Process* purposes would be some knowledge on the part of Novartis concerning the '197 patent's

shortcomings during its prosecution – something Plaintiffs do not even allege generally. Thus, the Complaint lacks plausible allegations that the '197 patent fails to meet the enablement requirement or that Novartis did anything unlawful at all in that respect.

Plaintiffs fail to allege any of the required substantive elements of fraud on the PTO – to say nothing of Rule 9(b)'s requirement that these allegations be pled with specificity. Absent any other basis for their claim that Novartis made fraudulent statements to the PTO regarding the '197 patent, the Complaint does not implicate any of the required *Walker Process* elements. Plaintiffs' fraud counts against Novartis thus flunk the plausibility standard, and the Court grants Novartis' Rule 12(b)(6) Motion in relevant part.

### c. Time-Barred Recovery

As a final basis for dismissal, the Court finds that Plaintiffs' *Walker Process* claim is barred by the statute of limitations. Generally, a federal antitrust claim that accrues more than four years prior to a plaintiff's suit is time-barred. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338 (1971). While the four-year statute of limitations generally begins running when the allegedly fraudulently procured patent issued, see, *Brunswick Corp. v. Riegel Textile*

*Corp.,* 752 F.2d 261, 268 (7th Cir. 1984), the situation may well be different where a purchaser plaintiff who is not a business competitor of the defendant merely claims to have paid supracompetitive prices for a product covered by the patent. *See, e.g., In re: Evanston Northwestern Healthcare Corp. Antitrust Litig.,* No. 07 C 4446, 2016 WL 4720014, at *8-9 (N.D. Ill. Sept. 9, 2016) (citing *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 295 (2d Cir. 1979)). In such cases, a cause of action for illegal monopolization under Section 2 of the Sherman Act may accrue once a purchaser plaintiff actually pays the supracompetitive price. *Berkey,* 603 F.2d at 295.

Under the general rule, Plaintiffs' *Walker Process* claim is unquestionably time-barred. Plaintiffs readily admit that the patent issued on September 25, 2001 (Compl. ¶ 22), meaning that the statute of limitations on their *Walker Process* claim expired on September 25, 2005. They did not file their claims against Novartis until March 1, 2017 – nearly a dozen years late. However, even the more lenient *Berkey* accommodation for purchaser plaintiffs is of no avail here. The Complaint alleges that Tarek's doctor began prescribing Diovan "for him long before January 2011," which he took without interruption until "[a]round the beginning of 2013," when he first tried generic valsartan. (Compl. ¶¶ 4-5.) The only prices Tarek was paying

for Diovan (in the form of a copay or, potentially, higher health benefit plan premiums associated with his Diovan prescriptions) he was paying well before March 1, 2013 – and thus his cause of action accrued before then, barring on statute-of-limitations grounds Plaintiffs' March 1, 2017 *Walker Process* claim against Novartis.

Ostensibly to invoke the discovery rule or fraudulent concealment to toll the statute of limitations, see, *In re Copper Antitrust Litig.,* 436 F.3d 782, 789 (7th Cir. 2006), Plaintiffs nakedly assert that they "could not find out how Novartis monopolized Diovan until July 12, 2014." (Compl. ¶ 24.) No detail is provided about what Plaintiffs learned on this date and why they could not reasonably have earlier discovered whatever it was. In fact, many of the allegations in the complaint undercut the notion that there was any concealed or undetectable injury resulting from Novartis' alleged wrongful exclusion of others from the market or extraction from Tarek of "an extremely high price" for Diovan. (Compl. ¶ 30.) For example, the '197 patent application and the August 24, 2000 Novartis press release, both of which form the basis for Plaintiffs' *Walker Process* claim, were matters of public record. Further, Tarek was aware by "the beginning of 2013" of facts

undercutting any claim that Novartis had monopolized the relevant market, as he was taking generic valsartan then.

Striding further down the rabbit hole, the Court notes that the *Walker Process* claim would be time-barred even if the discovery rule *did* apply to toll the statute of limitations until Plaintiffs knew or reasonably should have known that the prices paid for Diovan were supracompetitive. Plaintiffs have explicitly defined their injury as their Diovan copays that exceeded those charged for generic valsartan. Yet Plaintiffs allege that "around the beginning of 2013," Tarek tried to use generic valsartan and "[a]t that time" his "copay for Diovan was $30 and BCBS was paying $176.61, while he paid $12.6 for the generic and BCBS paid $0.0." (Compl. ¶ 5.) He thus became aware of the complained-of disparity in price more than four years prior to March 1, 2017 (although BCBSIL later increased his Diovan copay to $50). (It is not reasonable to infer that "the beginning of 2013" encompasses a date after March 1, 2013, and any uncertainty concerning the exact time at which Tarek discovered the disparity in copays flows from Plaintiffs' own imprecise allegations. *See, e.g., Morrison v. Int'l Union Sec., Police, and Fire Professionals of Am.,* No. 13 C 1146, 2013 WL 5274280, at *4 (D. Md. Sept. 16, 2013) (granting motion to dismiss with prejudice because the plaintiff's "imprecise

allegations" that harassment "occurred [continuously] throughout or during 2012" did "not satisfy the Court that any breach occurred within" the six-month statute of limitations); *Farbstein v. Hicksville Pub. Library,* 323 F.Supp.2d 414, 421 (E.D.N.Y. 2004) ("Plaintiff refers generally to events that occurred in the four year period prior to initiation of this lawsuit. . . . Thus, these imprecise allegations are ineffective, as framed, to rescue Plaintiff's . . . claims from the [three-year] statute of limitations.").)

For the sake of completeness, the Court notes that the continuing violation exception to the statute of limitations in antitrust actions is of no avail here either. *See, Zenith Radio Corp.,* 401 U.S. at 338. That exception allows an antitrust defendant's "overt act" to restart the statute of limitations, which act "'must be a new and independent act that is not merely a reaffirmation of a previous act'" and "'must inflict new and accumulating injury on the plaintiff.'" *Xechem, Inc. v. Bristol-Myers Squibb Co.,* 274 F.Supp.2d 937, 944-45 (N.D. Ill. 2003) (quoting *Grand Rapids Plastics, Inc. v. Lakian,* 188 F.3d 401, 406 (6th Cir. 1999)). Plainly, this case does not involve such an overt act. Continuing to charge direct purchasers prices in excess of those charged for generic valsartan is merely reaffirming prior pricing acts, much like the filing of

repeated infringement lawsuits that "did nothing more than reaffirm" prior efforts to block the same competitor from the market. *Xechem,* 274 F.Supp.2d at 945. More specifically, price increases are generally not considered overt acts, see, e.g., *Z Techs. Corp. v. Lubrizol Corp.,* 753 F.3d 594, 600-601 (6th Cir. 2014), as opposed to, for example, "a series of ongoing meetings to correct a cartel and adjust its prices." Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 320 (3d ed. 2007) ("If the mere charging of a monopoly price constitutes a 'continuing violation' tolling the statute, then we have indefinitely lengthened the statute of limitation on claims of successful monopolization.") (internal quotation marks and citation omitted). And even if bare price increases were overt acts, Plaintiffs' only specific allegation of a price increase that affected them is BCBSIL's increase of Tarek's copay to $50 "[a]round June 2013" (Compl. ¶ 6), passing on more of the cost of Diovan to consumers. This is not an overt act of Novartis.

For the foregoing reasons, Novartis' Rule 12(b)(6) Motion is granted in relevant part.

### 3. *Antitrust Violation of Section 7 of the Clayton Act*

In their third count, Plaintiffs allege that the "December 1996" merger of "two giants Ciba-Geigy and Sandoz," which

spawned Novartis, "resulted in a very harmful monopoly and price increase, which is against the antitrust laws." (Compl. ¶¶ 21, 33.) The Court charitably construes this as a claim brought under Section 4 for a violation of Section 7 of the Clayton Act, which is the principal federal antitrust statute concerning mergers and acquisitions, stock purchases, and joint ventures. It prohibits acquisitions, both direct and indirect, the effect of which "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. As with Sherman Act claims, if a party seeks to sue a putative section 7 violator, it must commence its enforcement action "within four years after the cause of action accrued," or the enforcement action "shall be forever barred." 15 U.S.C. § 15b. However, for many of the reasons already explored, these allegations fail to state a plausible claim.

### a.  *Antitrust Standing*

#### 1.  Proper antitrust plaintiff

With respect to antitrust standing under the Clayton Act, Plaintiffs are indirect purchasers of Diovan, and direct purchasers – such as drug wholesalers or distributors - are better situated under *Illinois Brick* to bring a Clayton Act lawsuit. *See, Illinois Brick,* 431 U.S. at 737-42 (holding that only overcharged direct purchaser, and not others in chain of

manufacture or distribution, is party "injured in his business or property" within meaning of Clayton Act). Although the Illinois Antitrust Act appears to permit indirect purchasers to sue for antitrust violations, 740 Ill. Comp. Stat. 10/7(2) ("No provision of this act shall deny any person who is an indirect purchaser the right to sue for damages.") – potentially making Plaintiffs' proper parties to challenge the Ciba-Geigy/Sandoz merger under state law – the federal pleading standards and statute of limitations otherwise mirror those governing claims under the Illinois Antitrust Act. *See, e.g.,* 740 Ill. Comp. Stat. 10/7 ("Any action for damages under this subsection is forever barred unless commenced within 4 years after the cause of action accrued."); *id.* at 10/11 ("When the wording of this act is identical or similar to that of a federal antitrust law, the courts of this State shall use the construction of the federal law by the federal courts as a guide in construing this Act."); *Hackman v. Dickerson Realtors, Inc.,* 520 F.Supp.2d 954, 968 (N.D. Ill. 2007) ("[T]he pleading requirements of the Sherman Act inform the pleading requirements under the Illinois Antitrust Act.") (citations omitted); *Laughlin v. Evanston Hosp.,* 550 N.E.2d 986, 990 (Ill. 1990) (holding that courts interpret the Illinois Antitrust Act in light of federal antitrust law upon which it is modeled). Thus, all the other

deficiencies explored herein leave Plaintiffs high and dry on any cognizable state-law challenge to the merger as well.

## 2. Antitrust injury

With respect to the antitrust injury necessary for standing, Plaintiffs fail to state a plausible claim that Novartis used its patent monopoly (presumed valid for the Clayton Act claim) unlawfully in the relevant market. Not only does the Complaint admit the existence of at least one generic valsartan manufacturer – and this during times that preceded expiration of the '197 patent by several years – but the mere allegation that Diovan has steadily increased in price is just as consistent (if not more so) with the rights Novartis enjoys by virtue of its immunized patent monopoly. (*See, Section III.A.2.a.1, supra.*)

### b. Time-barred Recovery

Moreover, although Clayton Act claims for violation of Section 7 may accrue later, the four-year statute of limitations generally begins to run as soon as the acquisition takes place. *See, United States v. E.I. du Pont de Nemours & Co.,* 353 U.S. 586, 598 (1957). As the merger Plaintiffs appear to challenge occurred over twenty years ago, quite clearly the statute of limitations has run under the default rule. For a merger that produced anticompetitive effects only *post*-merger, the statute

of limitations begins to run not when the merger transpired, but when the injury occurred. *E.I. du Pont,* 353 U.S. at 597-98. In the words of the Seventh Circuit, "old activity (as in *du Pont*, a stock acquisition preceding the suit by 30 years) is not immunized, if the potential for a reduction in output is created or realized more recently as market conditions change." *U.S. Gypsum Co. v. Ind. Gas Co.,* 350 F.3d 623, 628 (7th Cir. 2003). Yet Plaintiffs' claims are time-barred regardless of the theory invoked to delay accrual.

The Clayton Act's prohibition on anticompetitive acquisitions regulates injuries arising out of "holding as well as obtaining assets," *U.S. v. ITT Cont'l Banking Co.,* 420 U.S. 223, 240, 242 (1975), leading many courts to christen the theory for delaying the accrual date for such injuries the "hold-and-use doctrine." *In re: Evanston,* 2016 WL 4720014 at *12 (citations omitted). As such, subsequent anticompetitive acts committed by the merger enterprise may be dated "from the time these events actually transpired and not only from the date of the mergers which made these actions possible." *Julius Nasso Concrete Corp. v. Dic Concrete Corp.,* 467 F.Supp. 1016, 1023 (S.D.N.Y. 1979). However, for the hold-and-use doctrine to apply, a plaintiff must show – and thus must at least plead facts supporting a plausible inference – that the conduct was

made possible by the acquisition. *See, e.g., In re: Evanston,* 2016 WL 4720014 at *13; *Julius Nasso,* 467 F.Supp. at 1023. There are no such allegations here, and Ciba-Geigy or Sandoz on their own could have done precisely what Novartis allegedly did – patent a drug and unilaterally institute a steady price increase during the term of the patent monopoly. As distinguished from the situation in, for example, *In re: Evanston* – where health care providers in a certain geographic area merged and then later instituted an alleged supracompetitive pricing policy for services – unilaterally increasing the price of a brand-name drug is within the ambit of a lawful patent monopoly. *See, e.g., Schor,* 457 F.3d at 610; *Brand Name Prescription Drugs,* 186 F.3d at 786-87.

Even if the hold-and-use doctrine applied, Plaintiffs' cause of action would have accrued at the time Novartis instituted its supracompetitive pricing policy. *See, In re: Evanston,* 2016 WL 4720014, at *13. Although Plaintiffs provide data about price increases from 2013 through 2107 – that is, within the window of the four-year statute of limitations – they do not allege that Novartis kept the price of Diovan constant (or only increased it in proportion to, say, the consumer price index) prior to 2013. It is not reasonable to infer that Novartis, after securing its '197 patent monopoly in 2001,

waited until 2013 to increase Diovan prices under an allegedly supracompetitive pricing policy enabled by the 1996 merger. As such, even applying the hold-and-use doctrine to Plaintiffs' allegations does not bring their challenge to the merger within the four-year statute of limitations.

Next, Plaintiffs have no recourse here to the continuing violation doctrine, which does not apply to alleged violations of section 7 of the Clayton Act. *See, e.g., Z Techs. Corp. v. Lubrizol Corp.,* 753 F.3d 594, 599, 604-05 (6th Cir. 2014); *Midwestern Machinery Co., Inc. v. Northwest Airlines, Inc.,* 392 F.3d 265, 270-71 (8th Cir. 2004); *accord, Shuffle Tech,* 2015 WL 5934834, at *13-14. And even if it did, in the absence of an overt act (*see,* Section III.A.2.c, *supra*), "the doctrine would only at best allow [plaintiffs] to reach back to when [they were] first injured by the anticompetitive effects of the merger – that is, when [plaintiffs] paid [defendant's] supracompetitive prices." *In re: Evanston,* 2016 WL 4720014, at *14. Thus, this doctrine cannot do for Plaintiffs' challenge to the Novartis merger what it cannot do for Plaintiffs' *Walker Process* claim.

Similarly, and for the same reasons discussed in Section III.A.2.c, Tarek's taking (and presumably paying a copay) for Diovan "long before January 2011" anesthetizes *Berkey,* which suspends running of the statute of limitations

until a purchaser plaintiff pays the supracompetitive price. That clearly happened well before March 1, 2013. And, finally, even in the best case for Plaintiffs, where the discovery rule somehow applies to toll the four-year statute of limitations on their challenge to the merger until they discovered that they were paying a supracompetitive price (which Plaintiffs define with respect to the disparity in copays between Diovan and generic valsartan), their imprecise allegations about the timing of their discovery do not permit an inference that it occurred after March 1, 2013. (*See*, Section III.A.2.c.)

As such, there is no basis on which to find that Plaintiffs timely brought a federal or state antitrust claim challenging the merger.

\*   \*   \*

Therefore, Novartis' Motion to Dismiss under Rule 12(b)(6) is granted to the extent Plaintiffs' claims invoke a Section 7 violation of the Clayton Act or a comparable theory under the Illinois Antitrust Act.

## B. BCBSIL

Against BCBSIL, Plaintiffs bring counts for "violating the contract," "committing fraud to deny the proper coverage," "committing fraud to provide low quality medications," and "committing fraud to increase the incomes of its managements."

(Compl. ¶¶ 26-29.)   As best the Court can tell, these claims sound in breach of contract and common-law fraud.   Plaintiffs seek compensatory damages, punitive damages, costs, and attorneys' fees.

This case was removed from state court on the basis of Novartis' federal question claims.   (*See,* ECF No. 1 ¶ 4 ("This Court has original jurisdiction in this case under 28 U.S.C. § 1331."), ¶ 6 ("All Defendants consent to the removal of this matter pursuant to 28 U.S.C. § 1446(b)(2)(A).").)   Because the Court has dismissed the federal question claims against Novartis that grounded removal, it now searches for independent subject-matter jurisdiction to hear Plaintiffs' state law claims against BCBSIL.   Subject-matter jurisdiction is a threshold matter that must be established before resolving issues on the merits. *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 94-95 (1998).   The Court has an independent obligation to ensure that jurisdiction exists. *DeBartolo v. HealthSouth Corp.,* 569 F.3d 736, 740 (7th Cir. 2009).   Because Plaintiffs' claims for fraud and breach of contract do not arise under federal law, subject-matter jurisdiction to hear them can only be grounded in diversity jurisdiction under 28 U.S.C. § 1332, which requires that plaintiffs and defendants be citizens of different states and that the amount in controversy exceeds $75,000.

Plaintiffs do not allege their own citizenship in their Complaint. As individuals, Plaintiffs are citizens of the state in which they are "domiciled," that is, "the state in which a person intends to live over the long run." *See, Heinen v. Northrop Grumman Corp.,* 671 F.3d 669, 670 (7th Cir. 2012). In their Complaint, Plaintiffs list their address as 33W135 Bonnie Street, Saint Charles, Illinois 60174. They further claim to have health insurance coverage through BCBSIL by virtue of Soona's longtime employment with "School Dist. 33" (Compl. ¶ 1), evidencing an intent to remain in Illinois. *See, e.g., Newell v. O&K Steel Corp.,* 42 Fed.Appx. 830, 833 (7th Cir. 2002) (naming as factors relevant to domicile "current residence," "place of employment," and "location of property"); *24 Hour Fitness USA, Inc. v. Bally Total Fitness Holding Corp.,* No. 08 C 3853, 2008 WL 4671748, at *3 (N.D. Ill. Oct. 21, 2008) (also noting the importance of the "presence of family members"). In view of the mute pleadings, Plaintiffs appear to be domiciled in and citizens of Illinois for purposes of diversity jurisdiction.

In the same vein, Plaintiffs' Complaint does not allege the citizenship of BCBSIL. The Court has little reason to doubt that BCBSIL is an Illinois citizen for purposes of diversity. *See, e.g., Raines v. Health Care Service Corp.,* No. 86 C 5352, 1988 WL 58591, at *1 (N.D. Ill. May 31, 1988) ("Defendant Health

Care Service Corporation, a mutual legal reserve company d/b/a Blue Cross Blue Shield of Illinois ('Blue Cross') is a corporation with its principal place of business in Chicago, Illinois."); *Health Care Service Corp. v. Califano,* 466 F.Supp. 1190, 1192 n.8 (N.D. Ill. 1979) ("In 1975, HCSC was incorporated by the State of Illinois as a non-profit health care service corporation thus merging the Illinois Blue Cross and Blue Shield plans.") (citation omitted). Similarly, "Blue Cross and Blue Shield Association" is registered as an active Illinois corporation. *See,* Office of the Illinois Secretary of State, *https://www.ilsos.gov/corporatellc/CorporateLlcController* visited June 27, 2017). (Such filings are matters of public record and are properly subject to judicial notice. *See, e.g., GE Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1080–81 (7th Cir. 1997) (stating that a district court is permitted to take judicial notice of matters of public record); *City of Waukegan v. Bond Safeguard Ins. Co.,* No. 15 C 3007, 2015 WL 68770106, at *2 (N.D. Ill. Nov. 6, 2015) ("With respect to [the defendant's] state of incorporation, the Court takes judicial notice of filings with the Secretary of State. . . ."); *Patten v. Northern Trust Co.,* 703 F.Supp.2d 799, 803 n.2 (N.D. Ill. 2010) (finding it proper to take judicial notice of "matters of public record, such as [regulatory] filings").) Similarly,

according to its website, BCBSIL's headquarters are located at 300 East Randolph Street, Chicago, Illinois 60601. *See, BlueCross BlueShield of Illinois, Contact Us, https://www.bcbsil.com/employer/contact_us.htm* (visited June 27, 2017). Thus, BCBSIL appears to be a citizen of Illinois.

Absent diversity, the Court does not appear to have independent subject-matter jurisdiction over Plaintiffs' state-law claims against BCBSIL. As a result, the Court remands the balance of the case to Kane County Circuit Court. *See,* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."); *see, generally, Adkins v. Illinois Cent. R. Co.,* 326 F.3d 828 (7th Cir. 2003). Alternatively, to the extent the Court may enjoy residual authority to hear the claims based on supplemental jurisdiction – notwithstanding that the federal question anchor is now aweigh – the Court exercises its discretion to remand them. *See,* 28 U.S.C. § 1367(c) (permitting a district court to decline to exercise supplemental jurisdiction over a claim if it "has dismissed all claims over which the district court has original jurisdiction"); *see, generally, Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343 (1988); *Groce v. Eli Lilly & Co.,* 193 F.3d 496 (7th Cir. 1999).

## IV. <u>CONCLUSION</u>

For the reasons stated herein, Defendant Novartis' Motion to Dismiss [ECF No. 16] is granted. The claims against Novartis are dismissed with prejudice under Rule 12(b)(1) and, alternatively, Rule 12(b)(6). Absent the federal question claims against Novartis that formed the basis for removal, the Court remands the balance of the case to Kane County Circuit Court.


**IT IS SO ORDERED.**

_____
      Harry D. Leinenweber, Judge
      United States District Court

Dated: July 5, 2017